UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BENNY PEREZ,

          Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

Case No. 11-10182

District Judge Sean F. Cox
Magistrate Judge R. Steven Whalen

**REPORT AND RECOMMENDATION**

Plaintiff Benny Perez brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Parties have filed cross motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [DE # 11] be GRANTED and Plaintiff's Motion for Summary Judgment [DE #10] DENIED.

**PROCEDURAL HISTORY**

Plaintiff applied for DIB and SSI on September 25, 2007, alleging disability as of January 1, 1993 (Tr. 123, 127). Upon initial denial of the claim, Plaintiff requested an administrative hearing, held in Falls Church, Virginia on January 4, 2009 before Administrative Law Judge ("ALJ") Elliot Bunce (Tr. 28). Plaintiff, represented by attorney

John Morosi, testified by video conference (Tr. 29-38), as did Plaintiff's sister, Toni Greenwood (Tr. 35-50, 50-53). Vocational Expert ("VE") Pauline McEachin also testified (Tr. 38-41). On March 5, 2010, ALJ Bunce found that Plaintiff was not disabled (Tr. 23). On December 3, 2010, the Appeals Council denied review (Tr. 1-4). Plaintiff filed for judicial review of the Commissioner's decision on January 13, 2011.

## BACKGROUND FACTS

Plaintiff, born December 4, 1967, was 42 when the ALJ issued his decision (Tr. 23, 123). He completed 11th grade and worked as a maintenance worker until being incarcerated between 1994 and 2007 (Tr. 154, 156-157). His application for benefits alleges disability as a result of pancreatitis, lumbar spine problems, dyslexia, and attention deficit disorder ("ADD") (Tr. 153).

### A.  Plaintiff's Testimony

Plaintiff testified that his permanent residence was at his mother's house but that he was currently staying with his brother and his brother's wife and children (Tr. 35). He stated that he received a GED in prison but was only able to read at the third-grade level (Tr. 36). He reported that he stood 5' 9" and weighed 280 pounds (Tr. 37). He denied ever holding a driver's license or working since 2008 (Tr. 37). In response to the ALJ's observation that an SSA report showed earnings for the first quarter of 2009, Plaintiff stated that his work was terminated in 2008 after an altercation with his employer (Tr. 38).

Plaintiff denied performing household chores, alleging that he spent half his time reclining as a result of back pain and pancreatitis (Tr. 39). He indicated that prescribed pain

medication did not alleviate his pain (Tr. 40). He added that he currently took psychotropic medication for panic attacks (Tr. 40). He reported that he was currently being treated for post traumatic stress disorder ("PTSD") and received counseling every one or two weeks (Tr. 40-41). Plaintiff stated that during childhood he was physically abused by his father and was "beaten up" while in prison (Tr. 41).

Plaintiff alleged that he was unable to lift more than three pounds or walk more than a few feet due to leg cramps (Tr. 41). He admitted that he used marijuana occasionally but denied the use of other street drugs or current alcohol use (Tr. 42). He alleged short-term memory loss (Tr. 42-43).

In response to questioning by his attorney, Plaintiff stated that he was terminated from his most recent (2008) job because he "was going to punch the [boss] in the face" (Tr. 43). He acknowledged that he often feared that individuals conversing among themselves within earshot were talking about him (Tr. 44). Plaintiff stated "I don't deal with people" (Tr. 45). He noted that he had been told by a neurosurgeon that he did not require surgery, adding that he disagreed with the physician's findings (Tr. 46).

Plaintiff attributed his back problems to a prison incident in which he was struck by a large barrel (Tr. 47). He stated that he was given a lifting restriction of no more than five pounds (Tr. 48). He indicated that he recently received a diagnosis of Crohn's disease (Tr. 48). Plaintiff alleged that back pain obliged him to recline multiple times each day (Tr. 49). He denied being able to read a newspaper, but stated that he was able to read his five-year-old nephew's books (Tr. 49-50).

**B. The Testimony of Plaintiff's Sister**

Toni Greenwood acknowledged her brother's back problems but opined that "his anger issues" were a bigger problem (Tr. 51). She testified that a disagreement with her brother typically escalated into threats of violence (Tr. 51). She opined that counseling had not helped her brother and that he would be unable to control his temper at work (Tr. 52). She stated that Plaintiff had experienced anger management issues since grade school (Tr. 53).

**C. Medical Records**

**1. Treating Sources**

In January, 2005, Plaintiff reported that his back problems decreased when he exercised regularly (Tr. 274). In May, 2005, Plaintiff completed a year-long Assaultive Offenders Program ("AOP") (Tr. 275). His therapist diagnosed him with an antisocial personality disorder, but noted that his self-esteem had increased upon receiving a GED (Tr. 277). His therapist recommended that upon parole, Plaintiff should "obtain and maintain both stable employment and residence" (Tr. 278). He was assigned a GAF of 65[1] (Tr. 277). In August, 2005, Plaintiff was advised to lose weight (Tr. 384). He was noted to be non-compliant with medical advice to lose weight, exercise, and quit smoking (Tr. 383).

---

[1]GAF scores in the range of 61-70 indicate "some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders-Text Revision* at 32 (*DSM-IV-TR* ), 30 (4th ed.2000).

January, 2007 treating records refer to a 2003 MRI showing disc degeneration at L4-5 (Tr. 439). In July, 2007, Plaintiff sought emergency treatment after experiencing abdominal pain (Tr. 231). He was advised to discontinue non-steroidal anti-inflammatory drugs and follow a low fat diet (Tr. 233, 347). He was diagnosed with pancreatitis and hemorrhoids (Tr. 236). A CT of the abdomen showed swelling of the pancreas (Tr. 261-263, 315-316,336-337).

A December, 2007 imaging study of the lumbar spine found "minimal spondylosis between L3 and L5" with well maintained disc spaces (Tr. 480). A June, 2008 MRI of the lumbar spine found a disc herniation at L4-5 "resulting in mild compression of the right anterior thecal sac and possible compromise of the right nerve root" (Tr. 516-517, 542-543, 576-577). Neurosurgeon Ravindra N. Goyal noted that Plaintiff's mood, affect, and attention span were normal (Tr. 540). The same month, a doppler study of the lower extremity arteries showed significant abnormalities (Tr. 544, 579). In July, 2008, Plaintiff requested a work release after experiencing pancreatitis (Tr. 529-530). In August, 2008, Mohammed A. Zaman, M.D. recommended epidural steroid injections (Tr. 519, 581). Injections were administered without complications (Tr. 583-584). The same month, Dr. Goyal refused to prescribe additional pain medication (Tr. 539). A February, 2009 medical examination report restricted Plaintiff to 10 pounds lifting and standing and walking for less than two hours in an eight-hour day (Tr. 535). The same report found no mental limitations (Tr. 535).

A July, 2009 a psychiatric evaluation states that Plaintiff did not currently take psychotropic medications (Tr. 601). Plaintiff reported trouble controlling his temper (Tr.

602). Kishore Kondapaneni, M.D. observed poor concentration, judgment, and insight (Tr. 602). Plaintiff denied suicidal or homicidal ideations (Tr. 602). He was assigned a GAF of "around 50"[2] (Tr. 603). Plaintiff was deemed able to manage his own funds (Tr. 604). In September, 2009, Plaintiff reported that during his youth, his father had been physically abusive (Tr. 607). Plaintiff reported that he enjoyed going to bars and dancing (Tr. 607). He was appropriately dressed (Tr. 609). He was assigned a GAF of 45 (Tr. 611). In October, 2009, Plaintiff stated that he was asked to leave his mother's house after an altercation with his adult niece (Tr. 615). He was given a guarded prognosis (Tr. 622). In December, 2009, Dr. Kondapaneni found that Plaintiff's mental condition rendered him disabled, finding moderate to marked concentrational limitations, as well as moderate limitations in the ability to understand and carry out detailed instructions or maintain attention for extended periods (Tr. 623-624). Plaintiff's ability to stay on schedule and avoid being distracted by coworkers was also deemed moderately limited (Tr. 624). Plaintiff's ability to interact with supervisors and coworkers was deemed moderately limited, along with his ability to respond to workplace hazards or changes (Tr. 625). Plaintiff's ability to make plans independently of others and use public transportation was also deemed moderately limited (Tr. 625).

### 2. Consultive and Non-Examining Sources

In December, 2007 Mark Zaroff, Ph.D. performed a consultive psychological

---

[2] A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* ) (4th ed.2000).

examination of Plaintiff on behalf of the SSA (Tr. 472-476). Plaintiff denied hallucinations or delusions (Tr. 472). Although never married, Plaintiff reported that he had five children (Tr. 473). He confessed to smoking marijuana "one time a week at a party or something" but denied the use of street drugs (Tr. 473). Plaintiff stated that he had a girlfriend who was also the mother of one of his children (Tr. 473). He stated that he saw his two oldest children frequently (Tr. 473). Dr. Zaroff noted that Plaintiff made good eye contact and answered questions without difficulty (Tr. 473). Plaintiff opined that his biggest problem was anger (Tr. 474). He was oriented to person, place, and time with an intact memory (Tr. 475). Dr. Zaroff, noting that he had not been given treating records by the Michigan Department of Corrections ("MDOC") assigned a GAF of 42 (Tr. 476). He found a "poor" prognosis, opining that substance abuse prevented Plaintiff from handling his own funds (Tr. 476).

Also in December, 2007, a Psychiatric Review Technique by Mark Garner, Ph.D. found the presence of anxiety, personality, and substance addiction disorders (Tr. 493, 498, 500-501). Under the "'B'" Criteria," Dr. Garner found mild restrictions in daily living and moderate difficulties in social functioning and maintaining concentration, persistence, or pace (Tr. 503). A Residual Functional Capacity Assessment (mental) also by Dr. Garner, found that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions and maintain attention for extended periods (Tr. 507). His ability to accept instruction, get along with coworkers, and respond appropriately to workplace changes was also deemed moderately limited (Tr. 503). Dr. Garner opined that Plaintiff "would do best doing solitary or small group tasks, stating that Plaintiff "retain[ed] the ability

to do one and two step tasks on a sustained basis" (Tr. 509).

The same month, Bret Bielawski, D.O. conducted a consultive physical examination on behalf of the SSA (Tr. 481-484). Plaintiff reported that he was unable to read or write (Tr. 481). He demonstrated a full range of motion and was "cooperative in answering questions" (Tr. 482). Dr. Bielawski noted that Plaintiff's lumbar spine was tender, finding a possible need for surgery for lumbar spinal stenosis (Tr. 483).

In January, 2008, a non-examining Residual Functional Capacity Assessment (physical) performed on behalf of the SSA found that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit and stand for two hours and sit for six hours in an eight hour workday; and push and pull without limitation in the upper extremities (Tr. 486). His ability push/pull in the lower extremities was deemed limited by back problems (Tr. 486). His postural limitations consisted of frequent balancing and climbing of ramps and stairs; occasional stooping, kneeling, crouching and crawling; and a preclusion on ladder, rope, or scaffold climbing (Tr. 487). The Assessment found the absence of manipulative, visual, or communicative limitations, but found that Plaintiff should avoid concentrated exposure to hazards such as machinery and heights (Tr. 489). His claims were deemed "partially credible" (Tr. 490).

### 3. Material Submitted After the March 5, 2010 Administrative Decision[3]

---

[3]

Transcript pages 632 through 640 were submitted subsequent to the administrative decision (Tr. 629). Neither party cites these records. An independent review of the material indicates that a number of these records postdate the administrative opinion and are thus immaterial to the present action. Further, latter submitted records created *prior* to the March

In January, 2010, Plaintiff reported nightmares and flashbacks from his prison experience (Tr. 636). On March 26, 2010, a therapist under the direction of Dr. Kondapaneni noted that Plaintiff's hygiene and grooming were fair and that he had a restricted mood (Tr. 632). Plaintiff appeared "agitated and irritable" (Tr. 632). He was oriented to time, place, and person (Tr. 632). Plaintiff complained of hearing voices (Tr. 632). His Zyprexa dosage was doubled (Tr. 633).

### D.  VE Testimony

VE McEachin testified that Plaintiff did not have a recent long term work background (Tr. 54-55). The ALJ then posed the following hypothetical question, taking into account Plaintiff's age, education, and lack of work experience:

> [A]ble to perform more at the light exertional level, that requires no climbing, kneeling, crouching or crawling or more than occasional balancing and stooping, that consists of no more than simple, routine, repetitious tasks with one or two-step instructions, that does not impose what I will call strict production quotas, meaning the responsibility to produce a specified number of units of work in a specified period of time, that requires no more than occasional interaction with coworkers or supervisors and that does not require interacting with the public to perform the job duties. Would there be any unskilled, entry-level occupations that a person with this profile could perform?

(Tr. 55). The VE found that based on the hypothetical limitations, the individual could perform the light, unskilled work of a packager (80,000 positions in the national economy); kitchen helper (91,000); and machine operator (35,000) (Tr. 55). The VE stated that reading

---

5, 2010 administrative decision are not inconsistent with the material already before the ALJ and would not provide grounds for changing his decision.   42 U.S.C. § 405(g).

would be limited to "very simple words" (Tr. 55). The VE testified further that if the same individual were limited to sedentary work, he could perform the jobs of video surveillance monitor (82,000); visual inspector (65,000); and packager (sedentary)(120,000) (Tr. 56). She stated that her testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT").

In response to questioning by Plaintiff's attorney, the VE testified that if the same individual were limited by the need to recline multiple times a day, all work would be precluded (Tr. 57). She stated further that if the individual were "motivated to act violently" towards coworkers, he would be unable to perform any jobs (Tr. 58).

### E. The ALJ's Decision

Citing Plaintiff's medical records, the ALJ found that Plaintiff experienced the severe impairments of "degenerative disc disease, gastrointestinal disorder, obesity, affective disorder, anxiety disorder, post-traumatic stress disorder, and personality disorder" but that none of the conditions met or equaled any impairment listed in Appendix 1, Subpart P, Regulations No.4 (Tr. 13-14). The ALJ found that Plaintiff retained the following Residual Functional Capacity ("RFC"):

> [No] exertion above light level . . . or any climbing, kneeling, crouching, or crawling, or more than occasional balancing or stooping; or more than simple, routine, repetitious [tasks] with one or two-step instructions; or strict production quotas, defined as the requirement to produce a specified number of units of work in a specified period of time; or more than occasional interaction with coworkers or supervisors or any interaction with the public to perform the job duties

(Tr. 16).

The ALJ discounted Plaintiff's allegations of disability by noting that Plaintiff was informed by a treating source in 2008 that he was capable of sedentary work (Tr. 18). He cited therapy records created during Plaintiff's incarceration recommending that he maintain employment after leaving prison (Tr. 19).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## **FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## **ANALYSIS**

Plaintiff argues first that both the RFC and hypothetical question to the VE did not account for his full degree of impairment.  *Plaintiff's Brief* at 3-7.  Citing *Varley v. Secretary of HHS,* 820 F.2d 777, 779 (6th Cir. 1987), he contends that the hypothetical limitations posed to the VE (mirrored in the RFC) did not address his moderate deficiencies in concentration, persistence, and pace.  *Id.* at 4-5.

The failure to account for moderate concentrational deficiencies in the hypothetical

question constitutes reversible error. *Varley,* at 779.  While the ALJ need not use talismatic language or include the phrase "moderate deficiencies in concentration, persistence, and pace" in the hypothetical to avoid remand, *see Smith v. Halter,* 307 F.3d 377, 379 (6th Cir.2001), limitations such as "unskilled work," or "simple work" standing alone, may be insufficient to account for moderate concentrational impairments. *See Benton v. Commissioner of Social Sec.* 511 F.Supp.2d 842, 849 (E.D.Mich.,2007) (Roberts, J.); *Edwards v. Barnhart,* 383 F.Supp.2d 920, 931 (E.D.Mich.2005) (Friedman, J.); *Newton v. Chater,* 92 F.3d 688, 695 (8th Cir.1996); *McGuire v. Apfel,* 1999 WL 426035, 15 (D.Or.1999); *Roe v. Chater,* 92 F.3d 672, 676–77 (8th Cir.1996).  More recently in *Ealy v. Commissioner of Social Sec.,* 594 F.3d 504, 516-517 (6th Cir. 2010), the Sixth Circuit held that the hypothetical restrictions of "simple and repetitive tasks" did not fully address the plaintiff's moderate pacing restrictions.

   In the present case, the hypothetical question to the VE does not present grounds for remand.  Plaintiff cites *Edwards, supra,* for the proposition that based on the finding of moderate limitations in concentration, persistence, and pace, the hypothetical question should have, but did not address the "pacing"deficiencies.  In *Edwards,* the court found that the hypothetical question did not address moderate deficiencies in pacing, noting that the plaintiff would be unable to perform the quota-driven job findings of assembly, packing and sorting provided by the VE.  *Id.*  383 F. Supp. 2d at 930-931; *see also Ealy, supra,* 594 F.3d at 515-516.  In contrast here, the hypothetical question accounted for Plaintiff's pacing deficiencies by limiting him to "simple, routine, repetitious tasks with one or two-step instructions," not involving "strict production quotas," or requiring him "to produce a specified number of units

-13-

of work in a specified period of time . . . ." (Tr. 55).

Criticizing the VE's job findings, Plaintiff nonetheless asserts that "[i]t is difficult to believe that the [VE's job findings] would not include the need . . . to meet quotas, stay alert, and/or work at a consistent pace." *Plaintiff's Brief* at 6. However, he is short on the particulars of why moderate concentrational problems would render him unable to perform the work of a kitchen helper, machine operator, video surveillance monitor, visual inspector, or packager (Tr. 55). Likewise, I disagree that the hypothetical preclusion on all work with the public and only occasional interaction with coworkers is insufficient to account for a *moderate* social impairment (Tr. 55).

Plaintiff's related argument that Dr. Kondapaneni's December, 2009 finding of "moderate to marked" concentrational difficulties and a "disabling" personality disorder (Tr. 623-625) ought to have been adopted is also unavailing. The ALJ provided adequate reasons for rejecting the treating psychiatrist's "disability" opinion by noting that other treating records showed a lesser degree of social and concentrational limitations (Tr. 20, 535, 540, 609, 611). As such, he was not obliged to include the discredited findings in the hypothetical. *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118-119 (6th Cir.1994) (*citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987)) Because the ALJ's choice of hypothetical limitations and the ultimate RFC is well supported by the record, remand on this basis is not appropriate.

### B. The GAF Scores

Plaintiff argues next that the ALJ erred by discounting the import of the GAF scores

of 42 to 50 assigned by treating and consultive sources, contending that the relatively low scores ought to have been factored into psychological analysis. *Plaintiff's Brief* at 8; *see also* fn 2, above. He faults the ALJ for stating that the GAF scores did not directly correlate with "the severity requirements of the Mental Disorders Listings." *Id.* (citing Tr. 21). He contends that the fact that the ALJ was not required to adopt the GAF scores does not make the assessments irrelevant. *Id.*

The ALJ's finding that "GAF scores have no direct correlation to the severity requirements of the mental disorders listings" is well supported by case and regulatory law (Tr. 21)(citing 65 Red. Reg. 50764-65); *See also Kornecky v. Commissioner of Social Security,* 167 Fed.Appx. 496, 511, 2006 WL 305648, *14 (6th Cir. 2006)("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."); *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir.2002). "[A] [GAF] score may have little or no bearing on the subject's social and occupational functioning." *Kornecky,* at *13. A low GAF does not equate to occupational problems. Rather, a GAF of 41-50 "reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning." *Id.* (emphasis in original). Thus, ALJ Bunce did not err in finding the GAF scores peripheral to the assessment of Plaintiff' residual work abilities.

Further, while Plaintiff faults the ALJ for declining to adopt the GAF scores by Drs. Kondapaneni and Zaroff (a consultive examiner), his contention that the ALJ ignored or overlooked the gist of these sources' findings is without merit. Aside from providing reasons

for not adopting the GAF scores, the ALJ devoted a full-blown discussion to both sources' records, discussing at length his reasons for adopting certain findings and rejecting others (Tr. 13-16, 19-21). As such, the ALJ's discussion of the GAF scores does not provide grounds for remand.

### C. Disability at Step Three

Last, Plaintiff argues that his personality disorder mandates a disability finding at Step Three of the administrative sequence. *Plaintiff's Brief* at 9. Citing Dr. Kondapaneni's December, 2009 assessment, he contends that symptoms of a personality disorder, combined with marked limitations in concentration, persistence, and pace *and* repeated episodes of decompensation meet Listing § 12.08 (personality disorders). *Plaintiff's Brief* at 9 (citing 20 C.F.R part 404 Subpart P, Appendix 1).

"Personality Disorders" as stated in Listing 12.08 ("'A' Criteria") are characterized as follows:

> inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress, evidenced by at least one of the following:
>
> 1. Seclusiveness or autistic thinking
>
> 2. Pathologically inappropriate suspiciousness or hostility
>
> 3. Oddities of though, perception, speech and behavior
>
> 4. Persistent disturbances of mood or affect
>
> 5. Pathological dependence, passibity, or aggressivity
>
> 6. Intense and unstable interpersonal relationships and impulsive and

damaging behavior"

To meet Listing 12.08, the condition must a claimant must also show (under the "'B' Criteria") that the condition results in at least *two* of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

To be sure, ALJ Bunce acknowledged that Plaintiff exhibited some of the characteristics found in the "'A' Criteria" for a personality disorder at Step Two of the administrative sequence (Tr. 13). Thus, Dr. Kondapaneni's December, 2009 finding that Plaintiff experienced "moderate to marked" concentrational impairments and one or two episodes of decompensation in the previous year, if adopted, would have directed a finding of disability finding at Step Three (Tr. 623).

However, setting aside the question of whether Dr. Kondapaneni's finding of moderate/marked concentrational deficiencies really qualifies as a "marked" finding (*see* Tr. 623), substantial evidence supports the ALJ's ultimate conclusion that Plaintiff did not experience any marked mental limitations. The ALJ's exhaustive review of the treating records and consultive findings, discussed above, amply supports a finding of only *moderate*

social and concentrational limitations. My own review of the treating records supports the same conclusion. Plaintiff's prison therapist deemed him able to work, noting that he should "obtain and maintain . . . stable employment" (Tr. 278). In June, 2008, Dr. Goyal observed that Plaintiff's mood, affect, and attention span were normal (Tr. 540). A February, 2009 assessment by a treating physician's assistant found that Plaintiff did not experience mental limitations (Tr. 535). In July, 2009, Plaintiff stated that he liked "to go to bars and dance" (Tr. 607). Plaintiff was deemed able to handle his own funds (Tr. 604).

Dr. Zaroff's December, 2007 assessment also supports the ALJ's finding that Plaintiff did not experienced marked psychological limitations. Plaintiff reported that he saw his girlfriend daily and his two oldest children frequently (Tr. 473-474). His indirect admission that he attended social gatherings fairly regularly (admitting to smoking marijuana "one time a week at a party or something") stands at odds with his contention that he lacks either the social or concentrational abilities to perform unskilled work (Tr. 473). Although Dr. Zaroff deemed Plaintiff's prognosis "poor," he observed that Plaintiff was fully oriented, exhibited appropriate behavior, and was able to solve simple mathematical problems[4] (Tr. 473, 475).

In closing I note that my recommendation that the administrative opinion be upheld is not intended to trivialize Plaintiff's psychological limitations or his challenges in adapting to life outside of prison. However, a review of this record as a whole indicates that the

---

4

Further, Dr. Zaroff's prognosis of "poor," is undermined by the fact that he admitted that he did not have benefit of Plaintiff's MDOC treating records (Tr. 476). Notably, the MDOC records show a lesser degree of psychological limitation than that found by Dr. Zaroff (Tr. 277).

ALJ's determination is easily within the "zone of choice" accorded to the fact-finder at the administrative hearing level.  *Mullen v.  Bowen, supra.*

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [DE #11] be GRANTED and Plaintiff's Motion for Summary Judgment [DE #10] DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response

shall address specifically, and in the same order raised, each issue contained within the objections.

                                        s/ R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE JUDGE

Date: February 22, 2012

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on February 22, 2012.

                                          s/Johnetta M. Curry-Williams
                                          Case Manager